## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| MICHAEL TORRES, individually and on behalf of all others similarly situated,<br><br>Plaintiff, v.<br><br>GENERAL MOTORS LLC, ONSTAR LLC, LEXISNEXIS RISK SOLUTIONS, INC., and VERISK ANALYTICS, INC.,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Michael Torres individually and on behalf of all others similarly situated, brings this action against General Motors LLC ("GM"), OnStar LLC ("OnStar"), , LexisNexis Risk Solutions, Inc. ("LexisNexis", and Verisk Analytics, Inc. ("Verisk") collectively, "Defendants") and alleges, upon his personal knowledge as to his own actions and the investigation of counsel, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.    As has been widely publicized now, Defendants secretly collect data on Plaintiff's and the Class[1] Members' driver behavior data through software installed

---

[1]   As used herein, the "Class" refers to both the Nationwide Class and Texas Subclass, as defined in ¶ 42, *infra*, except where necessary to distinguish the two.

in their vehicle or via a linked application, and then sell or share this data to third parties without the consent of, or even knowledge of, Plaintiff and the Class Members.

2.      Plaintiff brings this action on behalf of a class of all persons who purchased or leased a vehicle from General Motors and had their personal driving data sold or provided to third parties, including Defendants OnStar, LexisNexis, Verisk and various insurance carriers, without their knowledge or consent.

3.      Modern vehicles are now equipped with all kinds of sensors and recorders that can collect, store, and transmit the personal and private driving information of their users. These metrics, which are digitally recorded, stored, and viewed through vehicle software and applications that are often inaccessible to— and unknown by—consumers, include things like a driver's average speed, the percentage of time a driver travels at speeds over 80 miles per hour, the frequency and intensity of acceleration and braking, and the amount of late-night driving.

4.      Defendants GM and OnStar install these types of driver tracking features on numerous GM vehicles. These data trackers are misleadingly marketed as experience "enhancements," when, in reality, they are used by GM and OnStar to surreptitiously document and store driver-behavior metrics which are then sold for profit to third parties, such as Defendants LexisNexis and Verisk.

5.      These third parties, including Defendants LexisNexis and Verisk, then

sell consumer drivers' data to other companies, including but not limited to automobile insurance companies, who then use the data to increase quotes and premiums for automobile insurance.

6. The driver analytics collected and transmitted by Defendants is taken out of context and because it is secretly collected and thus prevents drivers from providing any reasonable explanation about the various driving patterns contained in this data. Without such context, the data is misleading and not a reflection of actual driving habits.

7. Defendants' covert collection and later disclosure of consumer data not only violates Plaintiff's and the Class Members' various privacy rights, but can also cause undesirable consequences such as an increase in insurance premiums without any basis.

8. There are instances where vehicle purchasers may agree to having their driving behavior monitored and transmitted to insurance carriers, for purposes such as safe driving programs offered by either their insurance carriers or entities related to their vehicle manufacturer. But this is not that scenario.

9. Plaintiff and the Class Members here did not knowingly consent to have their driving behavior transmitted to any unauthorized third parties, and some declined to participate in such programs once they found out they were enrolled without their consent.

10.    Even those Class Members that opted into The OnStar Smart Driver Plan were not told that it was a way to invasively collect consumer driving data and then sell it to third parties without their consent. There is nothing in any of the relevant contracts or privacy policies that would allow for the dissemination of this data to a Class Member's insurance company or that would notify Plaintiff and the Class Members that it would happen.

11.    Plaintiff brings this action for economic damages and injunctive relief on behalf of all persons whose driver behavior data were captured, collected, stored, or transferred or sold without full notice or consent. Defendants' wrongful conduct constitutes a violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et seq., breach of contract, unjust enrichments, and as to the Texas Subclass, intrusion upon seclusion.

## JURISDICTION AND VENUE

12.    This Court has federal question jurisdiction because this case arises out of violation of federal law. 15 U.S.C. §1681 et seq.; 28 U.S.C. §1331.

13.    This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed class is a citizen of a state different from that of Defendants, (b) the amount in controversy exceeds $5,000,000 exclusive of interests and costs, (c) the proposed class consists of more than 100 class members, and (d) none of the exceptions under

the subsection apply to this action. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

14.    This Court has personal jurisdiction over Defendants under 28 U.S.C. § 1407 because each Defendant has intentionally availed itself of the markets within Georgia such that the exercise of jurisdiction by this Court is proper and necessary. Defendants have engaged, and continue to engage, in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, the state of Georgia, and this District.

15.    Venue is proper in this Court because the principal place of business of Defendant LexisNexis is in this District. In addition, a substantial part of the events and/or omissions giving rise to the underlying action occurred in this District.

## **PARTIES**

16.    Plaintiff Michael Torres is a citizen of Texas. He purchased a 2019 Chevrolet Spark, 2021 Chevrolet Traverse, and 2024 Chevrolet Trax. Plaintiff was enrolled in the OnStar Smart Driver+ program and never knowingly agreed to have his Driver Behavior Data transmitted to unauthorized data brokers or insurance companies. On information and belief, Plaintiff's data appears on his LexisNexis Consumer Disclosure Report.

17.    Defendant General Motors is a Delaware limited liability company headquartered in Detroit, Michigan. At all times relevant, GM sold vehicles in Texas

that included hardware and software for driver behavior tracking, including OnStar, MyChevrolet, and MyCadillac.

18.    Defendant OnStar LLC is a Delaware corporation headquartered in Detroit, Michigan. Both GM and OnStar are wholly owned by General Motors Holdings LLC.

19.    Defendant LexisNexis Risk Solutions, Inc. is a Delaware corporation headquartered in Alpharetta, Georgia. Among other things, it is a consumer reporting agency that in this instance is governed by the FCRA.

20.    Defendant Verisk is a Delaware corporation headquartered in Jersey City, New Jersey. Among other things, it is a consumer reporting agency that is governed by the FCRA.

## BACKGROUND

### *GM Vehicles can and do collect user data*

21.    GM vehicles starting with model year 2015 have the capability to use OnStar software and related applications. Since that time, GM has been equipping its vehicles with computer modules and sensors that enable the vehicle to collect data about the driver and occupants. These computer modules can send this information about the driver and the operation of the vehicle directly to GM.

22.    The software and applications on these vehicles, including MyChevrolet, MyBuick, and MyCadillac, allows GM and OnStar to record, collect,

store, and transmit data about vehicle condition (e.g., engine or transmission status, etc.), as well as driver specific data. The latter data includes metrics with reports of average speed, percentage of time speed exceeds 80 miles per hour, the frequency and intensity of acceleration and braking, and late-night driving.

23.     The information that GM vehicles collect falls into three categories: (1) data generated in a vehicle but not transmitted outside the vehicle; (2) data transmitted outside the vehicle that happens with certain subscription services and applications such as crash notifications and certain diagnostics; and (3) data transmitted in and out of the vehicle, such as navigation systems.

24.     GM and OnStar do not tell consumers that this data is being collected and potentially transmitted to third parties, nor is the consumer/driver compensated for the collection and sale of his or her data. Rather, GM and OnStar make money by selling the consumer driver data to third parties such as Defendants LexisNexis and Verisk, who then in turn resell the consumer driver data to other third parties, including automobile insurers.

25.     To add insult to injury, the sale of the data to automobile insurers often results in higher insurance quotes and premiums for those drivers whose personal and private data has been surreptitiously sold.

26.     GM and OnStar fraudulently represent that the data collected is part of "an optional service that provides customers with information about their driving

behavior to help them maximize their vehicle's overall performance, reduce vehicle wear and tear and encourage safer driving." But the truth is, this data collection is actually part of a hidden scheme used to increase revenue.

### GM's OnStar collects driver data

27.    OnStar was founded in 1996 and produces driver assistance software for GM vehicles, including Chevrolets, Buicks, Cadillacs, and GMCs. OnStar is wholly owned by GM.

28.    OnStar provides subscription-based communications like in vehicle security, emergency services, turn-by-turn navigation, and remote diagnostics. The current generation of OnStar software is compatible with GM vehicles manufactured from 2015 to the present.

29.    The OnStar software installed in the Class Vehicles can record and transmit driver data via GPS (for purposes of navigation, reporting emergencies, etc.) and OBD-II ("On-Board Diagnostics"). When this software is linked with OnStar applications such as MyChevrolet, MyBuick, and MyCadillac, these applications get Driver Behavior Data recorded by the onboard software and can become an additional means of transmission.

30.    In June of 2022, GM began including three-year pre-paid OnStar services as a standard option in Buicks, Cadillacs, and GMCs. The $1,500 cost was included as part of the standard retail price so drivers did not have a choice as to

whether to agree to having OnStar in their vehicles.

***Defendant LexisNexis collects, analyzes, and resells driver data***

31.    LexisNexis is a consumer reporting agency which markets itself as "a trusted analytics provider for industries around the globe, including financial services, retail/ecommerce, logistics and telecommunications."

32.    LexisNexis promotes its services to auto insurers, claiming its services "help insurers and automakers streamline business processes, control costs and improve customer experiences." These services include providing collected driver data and analytics, which can be used to set or affect drivers' automobile insurance quotes or premiums.

33.    LexisNexis proclaims it can "provide timely connected car data and mobility risk insights[.]" And it markets that it "receive[s] and manage[s] data from connected vehicles, mobile apps and third-party services[,]" and that this data "improve[s] [insurers'] ability to assess risk and capture otherwise missed premium." LexisNexis also says that it "bring[s] automakers and insurance carriers together" by "turn[ing] connected car data into tangible driving behavior insights that can be leveraged within insurance carriers' existing workflows."

34.    By doing so, LexisNexis facilitates insurance companies using the driver behavior data they purchase to reassess risk and increase the premiums of the drivers' insurance policies or set higher rates on new policies.

9

35.    Since the information is obtained and provided without the driver's consent, the driver has no ability to address the information transmitted to insurance carriers. Thus, it is provided without context and deprives the driver or owner the chance to explain the data, rendering it subject to misuse in the context for which LexisNexis provides it.

36.    LexisNexis' actions, as described above, violate FRCA Section 1681(b), which requires a consumer reporting agency such as LexisNexis to implement and maintain reasonable procedures for meeting the needs of the insurance industry in a manner that is fair and equitable to the consumer with regard to the confidentiality, accuracy, relevancy and proper use of such information.

***Defendant Verisk creates driver risk scores from the driver data and sells those to insurance companies***

37.    Verisk is a self-described consumer reporting agency "at the intersection of people, data, and advanced technologies."[2] "[w]e deliver immediate and sustained value to our customers and through them, to the individuals and societies they serve."

38.    Verisk further describes itself and its services to insurance companies "[a]s a strategic partner to the global insurance industry, our advanced data analytics,

___

[2] About Verisk, https://www.verisk.com/company/about/ (Last accessed May 24, 2024).

software, scientific research, and deep industry knowledge can help you along the path to profitable growth—now and in the future." These services include the provision of consolidated third-party data, including driver habit and behavior, that can be used to set or modify drivers' vehicle insurance quotes or premiums.

39.    Verisk promotes, as part of its advertising for these services, that the services, by way of data collection and creation of a driver risk score, can be used by drivers to demonstrate positive driving history for use in addressing insurance premiums. But the driver risk score transmitted to insurance carriers is sent without opportunity for drivers to explain behavioral information because it is obtained without their consent. Thus, it negatively affects consumers' insurance premiums in an unfair and misleading way.

40.    Verisk's actions and inactions, by failing to put this information in context and not providing drivers with the opportunity to review and correct this information, also violates FRCA Section 1681(b).

41.    Drivers cannot be held to have knowingly consented to the disclosures alleged herein. To the extent there was any disclosure about collection of data, it did not reasonably explain to a layperson that consumers' data would be exchanged among Defendants for profit and disclosed to their detriment.

## CLASS ACTION ALLEGATIONS

42.    Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23

on behalf of a Nationwide Class defined as:

> All persons residing in the United States who, within the applicable statute of limitations, purchased or leased a vehicle from GM and had their vehicle's driving data collected by Defendants and shared with, for profit or otherwise, a third party without their consent.

Plaintiff also brings this case as a class action pursuant to Fed. R. Civ. P. 23 on behalf of a Texas Subclass defined as:

> All persons residing in the state of Texas who, within the applicable statute of limitations, purchased or leased a vehicle from GM and had their vehicle's driving data collected by Defendants and shared with, for profit or otherwise, a third party without their consent.

43.    Collectively, the Nationwide Class and Texas Subclass will be referred to as the "Class" except where necessary to distinguish between the two.

44.    Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any of Defendants' officers or directors, any successors, and any judge who adjudicates this case, including their staff and immediate family.

45.    This case satisfies the numerosity, commonality, typicality, and adequacy requirements of Fed. R. Civ. P. 23.

**Numerosity:** While the exact number of class members cannot be determined without discovery, upon information and belief, GM and OnStar shared and/or sold millions of consumer drivers' driver behavior data to third parties including, but not limited to, LexisNexis and Verisk without their consent. The Class is therefore

so numerous that joinder of all members is impracticable;

**Ascertainability:** Members of the Class are readily identifiable from information in Defendants' possession, custody, and control;

**Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all Class Members, had his driving telematics data collected and shared with third parties without his consent. Plaintiff and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims thus arise from the same practices and/or course of conduct that give rise to the claims of all Class Members;

**Adequacy:** Plaintiff will fairly and adequately protect the proposed Class's interests. Plaintiff's interests do not conflict with the Class's interests, and Plaintiff has retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

**Commonality:** The claims of Plaintiff and the Class raise predominantly common factual and legal questions that a class wide proceeding can answer for the Class. Indeed, it will be necessary to answer the following questions, which include:

> i.   Whether GM vehicles equipped with OnStar can record, store, and transfer class members' driving behavior;
>
> ii.  Whether GM and OnStar used that software to record, store, and transfer Class Members' driving data;

iii.    Whether GM and OnStar recorded, stored, and transferred Class Members' driving behavior data without full knowledge and consent;

iv.    Whether GM and OnStar sold or otherwise supplied Class Members' driving data to third parties, including Defendants LexisNexis and Verisk without the knowledge and consent of class members;

v.    Whether LexisNexis obtained Class Members' driving data without the knowledge and consent of Class Members;

vi.    Whether LexisNexis sold or otherwise supplied Class Members' driving data to third parties without the knowledge and consent of class members;

vii.    Whether Verisk obtained Class Members' driving data without the knowledge and consent of Class Members;

viii.    Whether Verisk sold or otherwise supplied Class Members' driving data to third parties without the knowledge and consent of Class Members;

ix.    Whether Defendants' conduct violates the FCRA and common law principles; and

x.    The amount and extent of damages to Plaintiff and other class

14

members as a direct and proximate result of Defendants' conduct, and the scope of monetary and injunctive relief as to same.

46.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy. No unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants. As such, it would be impracticable for Class Members to individually seek redress from Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not.

47.    Further, individual litigation could potentially result in vastly different rulings and/or standards of conduct for Defendants. For example, one court may enjoin Defendants' conduct whereas another may not. The potential for such inconsistent or contradictory judgments will increase delay, burden, and expense to all parties and the court system.

48.    **Predominance:** Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to adjudicate the controversy

fairly and efficiently. The damages available to Plaintiff and the Class Members individually are insufficient to make individual lawsuits economically feasible.

## COUNT I

### Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*. (Against Defendant LexisNexis and Verisk)

49.     Plaintiff incorporates the foregoing allegations as though fully set forth herein.

50.     Plaintiff brings this claim on behalf of himself and all similarly situated Class Members.

51.     Plaintiff and each of the Class Members are a "person" and a "consumer" within the meaning of the FCRA. 15 U.S.C. § 1681a.

52.     When a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure the maximum possible accuracy of the information concerning the individual described in the report. 15 U.S.C. § 1681e(b).

53.     LexisNexis and Verisk are each consumer reporting agencies within the meaning of the FCRA.

54.     LexisNexis and Verisk each provided information to third parties disclosing driver behavior data about Plaintiff and the Class Members in a form that constitutes a "consumer report" within the meaning of the FCRA.

55.     LexisNexis failed to maintain procedures to maintain maximum

possible accuracy regarding Plaintiff and the Class Members' driver behavior data before disseminating it to auto insurance carriers.

56.     Auto insurance carriers who received this information from LexisNexis obtained an inaccurate representation of Plaintiff and the Class Members' driver behavior data.

57.     These acts and omissions constitute willful or negligent violations of the FCRA, including but not limited to 15 U.S.C. § 1681e(b).

58.     As a result of each willful violation of the FCRA, Plaintiff and the Class Members are entitled to actual and statutory damages pursuant to 15 U.S.C. § 1681n(a)(1), punitive damages pursuant to 15 U.S.C. § 1681n(a)(2), and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from Defendants.

59.     As a result of each negligent noncompliance with the FCRA, Plaintiff and the Class Members are entitled to actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681o(a)(2) from Defendants.

## COUNT II

### Unjust Enrichment
### (Against Defendants GM and OnStar)

60.     Plaintiff incorporates the foregoing allegations as though fully set forth herein.

61.    Plaintiff and the Class Members purchased or leased vehicles manufactured and sold or leased by Defendant GM through authorized dealers and agents of GM.

62.    Defendants GM and Onstar are in privity with Plaintiff and the proposed Class or, in the alternative, privity is not required under the applicable laws.

63.    By buying or leasing their vehicles and included software, and by unknowingly providing their driving data, Plaintiff and the Class Members conferred a benefit on GM and OnStar.

64.    GM and OnStar knew of the above referenced benefit conferred by Plaintiff and the Class and knew they did not reasonably or fully disclose what they would do with it. Plaintiff and the Class were unaware their data would be sold or that it would be used to their detriment. Defendants therefore were unjustly enriched at the expense of Plaintiff and the Class.

65.    Under equitable principles, GM and OnStar should not be permitted to retain the full value unjustly obtained from Plaintiff's and the Class's driving data because had Plaintiff and the Class known the extent to which and how their data would be used, they would not have permitted its collection and disclosure.

66.    GM and OnStar should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable

proceeds received by them because of their misconduct.

## COUNT III

### Breach of Contract
### (Against Defendants GM and OnStar)

67.     Plaintiff incorporates the foregoing allegations as though fully set forth herein.

68.     There is a valid contract between GM and Plaintiff and the Class Members in the form of the General Motors U.S. Connected Services Privacy Statement. When Plaintiff and the Class Members bought or used a GM vehicle and contracted for GM's connected services, both Plaintiff and the Class Members and GM entered into and agreed to the terms of this contract.

69.     Plaintiff and the Class Members provided consideration for this contract when they purchased a GM vehicle or used a GM vehicle and contracted for the connected services.

70.     This contract states that although the vehicle, GM Connected Service, or app may collect driving and performance information when a purchaser or user of a GM vehicle interacts with GM through its Connected Services or apps, that driving and performance data will only be shared "within GM, with automotive dealers, licensees, and companies with whom [GM enters] into business relationships, in order to develop, enhance, provide, service, maintain, and improve

19

the safety, security, and quality of [GM's] products, programs, and services."

71.    What it does not say is that this collected data and information will be sold to third parties for ultimate use to set or increase insurance rates or any other service unrelated to the operation of a user's vehicle.

72.    As alleged above, GM has breached the terms of this contract by selling driver specific data and analytics to third parties for purposes unrelated to the services and products provided to the vehicle owner.

73.    By selling this data to a third party who was not providing benefits, maintenance, or other services to improve the safety and quality of GM's products and services, GM has breached its obligations under the above contract and failed to fulfill the terms of that contract.

74.    In breaching this contract, Defendant GM has caused Plaintiff and the Class Members several harms, including increased insurance premiums or the inability to purchase auto insurance at fair market prices and causing Plaintiff and Class Members to overpay for their GM vehicle and OnStar or Connectivity Services.

75.    As a result of GM's and OnStar's breach of contract, Plaintiff and Class Members are entitled to damages in an amount to be proven at trial.

**COUNT IV**
**CLAIM FOR DECLARATORY & INJUNCTIVE RELIEF**

76.    Plaintiff incorporates by reference and realleges each and every

allegation contained above, as though fully set forth herein.

77.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described in this complaint.

78.     Defendants GM and OnStar owe duties of care to their customers, including Plaintiff and Class Members.

79.     Defendants LexisNexis and Verisk owe duties under the FCRA to provide correct and factual information in consumer reports.

80.     Defendants continue to sell or otherwise provide false and contextually misleading Driver Behavior Data, in violation of their respective legal duties, thereby continuing to damage Plaintiff and Class Members as described above.

81.     Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, that Defendants' sale of false and contextually misleading Driver Behavior Data violates their legal duties.

82.     The Court should also issue corresponding prospective injunctive relief requiring Defendants to cease selling or otherwise providing false and contextually misleading Driver Behavior Data and to remove all such information from Defendants' servers.

83.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and will lack an adequate legal remedy. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. The costs of complying with the injunction would be relatively minimal for Defendants in comparison with the costs to Plaintiff and Class Members of paying higher insurance rates and premiums that they cannot afford.

84.    Issuance of the requested injunction would not disserve the public interest. To the contrary, such an injunction would benefit the public by calming public concern about the privacy of Driver Behavior Data and by slowing the increase in auto insurance rates and premiums that result from auto insurance carriers receiving false and misleading information about customers and prospective customers.

## COUNT V

### Intrusion on Seclusion
### (Plaintiff and Texas Subclass Members against All Defendants)

85.    Plaintiff incorporates the foregoing allegations as though fully set forth herein.

86.    Plaintiff alleges this claim for relief on behalf of himself and all similarly situated Texas Subclass Members.

22

87.    Plaintiff and Subclass Members have a right against improper intrusion into their secret and private affairs. This includes a right of privacy in their own personal data, including their driver behavior data. Consumers have a reasonable expectation of privacy that their driving behavior will remain private and will not be sold or disclosed to third parties without their consent.

88.    Defendants intentionally intruded on Plaintiff and Subclass Members' right of privacy in their personal and private affairs by intentionally accessing, recording, storing, furnishing, and selling their driver behavior data to auto insurance carriers through a method highly offensive to a reasonable person.

89.    Defendants' intrusion on seclusion is and always was done without consent of Plaintiff or Subclass Members especially regarding Defendants' furnishing and selling their driver behavior data.

90.    Driver behavior data that Defendants intentionally accessed, recorded, stored, furnished, and sold was private, and not in form obvious to the public, to include driver's average speed, the percentage of time a driver travels at speeds over 80 miles per hour, the frequency and intensity of acceleration and braking, the amount of late-night driving, etc. This information is private in part because it is longitudinal, i.e. taken over time, far beyond what members of the public would observe in a snapshot driving next to Defendants' vehicles with Defendants' onboard systems.   As such, Plaintiff and Subclass Members had at all relevant times a

subjective and objectively reasonable expectation of privacy in such driver behavior data.

91.    This driver behavior data has monetary value, which Defendants wrongly expropriated at Plaintiff and Subclass Members' expense. That value derives from Defendants' ongoing investigation and examination into private concerns of Plaintiff and Subclass Members including their drivers' habit, personality, and other sensitive personal traits, which are Plaintiff and Subclass Members' private affairs in solitude and seclusion.

92.    Defendants took Plaintiff and Subclass Members' driver behavior data, which should have been a private matter, both under common law and pursuant to Plaintiff and Subclass Members' contract with Defendants, and exposed it to scrutiny by auto insurance carriers and other third parties. This is intrusion on seclusion by unauthorized disclosure of private affairs under Texas law.

93.    Defendants' intrusive, purposeful disclosure to third parties including auto insurance carriers of Plaintiff and Subclass Members' driver behavior data occurred over the long term, lasting weeks, months, or years.

94.    The prolonged duration of such focused disclosure to third parties including auto insurance carriers of Plaintiff and Subclass Members' private affairs, without consent, is a highly offensive intrusion that violates subjective and objectively reasonable privacy expectations.

95.   Defendants' accessing, recording, storing, furnishing, and selling of Plaintiff and Subclass Members' private affairs is, to a reasonable person, a highly offensive intrusion on seclusion.

96.   Defendants' intrusion was substantial and unreasonable and led to the unwanted exposure of Plaintiff and Subclass Members' private affairs and information.

97.   As a direct and proximate result of Defendants' intrusion, Plaintiff and Subclass Members have suffered damages including, but not limited to, increased auto insurance rates and an invasion of their privacy in an amount to be ascertained at trial.

## PRAYER FOR RELIEF AND JURY TRIAL DEMAND

Plaintiff and the Class demand a jury trial on all claims so triable and request that the Court enter an order:

(a)   Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing Plaintiff's counsel to represent the Class;

(b)  Awarding declaratory, injunctive, and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

(c)  Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

(d)  Enjoining Defendants from further violations of statutes and common law that would further damage Plaintiff and the Class;

(e)  Awarding Plaintiff and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

(f)  Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

(g)  Awarding attorneys' fees and costs, as allowed by law;

(h)  Awarding prejudgment and post-judgment interest, as provided by law;

(i)  Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

(j)  Granting such other or further relief as may be appropriate under the circumstances.

Respectfully submitted this 24th day of May, 2024.

*/s Roy E. Barnes*
Roy E. Barnes
Ga. Bar No. 039000
John R. Bevis
Georgia Bar No. 056110
J. Cameron
Tribble Georgia
Bar No. 754759

**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, GA 30060

*/s/ Gayle M. Blatt*
Gayle M. Blatt*
Jeremy K. Robinson*
P. Camille Guerra*

**CASEY GERRY SCHENK
FRANCAVILLA BLATT &**

Telephone:  (770) 227-6375
roy@barneslawgroup.com
bevis@barneslawgroup.com
ctribble@barneslawgroup.com

**PENFIELD, LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
gmb@cglaw.com
jrobinson@cglaw.com
camille@cglaw.com

*\* Applications for Pro Hac Vice Forthcoming*

*Attorneys for Plaintiff & the Proposed Class and Subclass*